## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Michael D. Benson,

                Plaintiff,

v.

Ron Fischer, *Group Supervisor/Officer of the Day*, *et al.*,

                Defendants.

Case No. 16-cv-509 (DWF/TNL)

**\*FILED UNDER SEAL\***

**REPORT & RECOMMENDATION**

---

Michael D. Benson, MSOP, 1111 Highway 73, Moose Lake, MN 55767 (pro se Plaintiff); and

Aaron Winter and Ralph John Detrick, Assistant Attorneys General, Minnesota Attorney General's Office, 445 Minnesota Street, Suite 1100, St. Paul, MN 55101 (for Defendants).

---

## I. INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment, ECF No. 84, and Plaintiff's Motion for Summary Judgment, ECF No. 112. These motions have been referred to the undersigned for a report and recommendation to the Honorable Donovan W. Frank, United States District Judge for the District of Minnesota, pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons set forth below, the undersigned recommends that Defendants' motion be granted; Plaintiff's motion be denied; and this matter be dismissed with prejudice.

## II. PROCEDURAL HISTORY

Michael D. Benson is involuntarily committed to the Minnesota Sex Offender Program ("MSOP").  By Amended Complaint, Benson brought this action against officers and employees of the Minnesota Department of Human Services pursuant to 42 U.S.C. § 1983, asserting numerous violations of his civil rights.  *See generally* Am. Compl., ECF No. 5.  Following dispositive motion practice, Benson's remaining claims relate to the denial of food for three days (Count II) and his placement in MSOP's High Security Area ("HSA") for approximately 24 hours (Counts III, IV, V).  *Benson v. Piper*, No. 16-cv-509 (DWF/TNL), 2017 U.S. Dist. LEXIS 158017, at *12 (D. Minn. Mar. 31, 2017) [hereinafter *Benson II*].

## III. FACTS

Benson was civilly committed to MSOP in 1993 and has resided at MSOP's Moose Lake facility since approximately 2012.  Benson Dep. 8:20-21, 15:5:-19, 17:24-18:1, Ex. A to Decl. of R.J. Detrick, ECF No. 90-1.  MSOP's Moose Lake facility is a secure treatment facility.  The events in this litigation took place in February 2016.[1]

### A.  Client Identification Policy

At the time of the events in question, MSOP's Client Identification Policy required clients to wear identification badges containing the client's name and photograph.  Decl.

---

[1] The parties have each included policies with effective dates post-dating the events in question.  *See, e.g.*, Ex. 2 to Decl. of Terrance Kneisel (effective Feb. 7, 2017), ECF No. 95-2; Exs. 2 (effective Oct. 1, 2019), 4 (effective Aug. 6, 2019), 6 (effective Sept. 3, 2019), 8 (effective Sept. 3, 2019) to Decl. of Ann Linkert, ECF No. 98-1; Benson's Ex. A at A-7 to A-19 (effective June 4, 2019), A-36 to A-39 (effective Sept. 3, 2019), ECF No. 115.  The Court cites to policies in effect during the events in question.

of Ann Linkert ¶ 8, ECF No. 98; Client Identification Policy[2] at 1 [hereinafter CIP], Ex. 5 to Linkert Decl., ECF No. 98-1; *see* Ex. B to Detrick Decl., ECF No. 91; Benson Dep. 131:17-132:14, 187:9-21.  The identification badge also contained the words "Minnesota Sex Offender Program."  Ex. B to Detrick Decl.; *see* Benson Dep. 32:2-33:6.  Clients are required to wear the identification badges "with the photograph facing forward in an area between the client's neck and waist."  CIP at 4.  Benson wore his identification badge clipped to the hem of the bottom of his shirt with his picture facing out.  Benson Dep. 34:9-15, 42:4-9.

The purpose of the Client Identification Policy is "[t]o enhance the security and integrity of [MSOP] facility systems by ensuring the positive identification and tracking of clients."  CIP at 1.  The identification badges do this in a number of ways.  There are over 400 clients at MSOP's Moose Lake facility and some staff members "float among [the] different living units."  Linkert Decl. ¶¶ 9, 12.  Given the number of clients and varying work assignments, "staff may not know every client on a particular living unit, even if all of the clients have been there for some time."  Linkert Decl. ¶ 12; *see* Linkert Decl. ¶ 9.  The identification badges ensure that MSOP staff are able to "easily and accurately ascertain a client's identity," allowing staff "to hold clients accountable when they break the rules and to positively reinforce good behavior."  Linkert Decl. ¶ 10.  Further, "while MSOP security staff do wear uniforms," MSOP clients and other facility staff do not.  Linkert Decl. ¶ 9.  Accordingly, the identification badges  "ensure that

---

[2] Policy No. 420-5255, effective December 1, 2015.

clients do not enter unauthorized areas or attempt to exit MSOP's secure perimeter." Linkert Decl. ¶ 9.

### B.  ID Verification Count Procedure

In February 2016, MSOP's client-count policy included a procedure known as an "ID verification count."  Linkert Decl. ¶ 11; *see* Facility Counts Policy[3] at 1, Ex. 7 to Linkert Decl., ECF No. 98-1.  An ID verification count is a "count requiring face-to-face contact with every client, conducted by matching a client's face to the client's picture and name on his or her badge."  Facility Counts Policy at 1.  During an ID verification count of a living unit, "each client had to be in his room" with his badge visibly displayed. Linkert Decl. ¶ 11 (footnote omitted); *see* Facility Counts Policy at 4.  The refusal of a client to display his or her identification badge during an ID verification count disrupts "the operation of the entire facility" and "[c]lients must remain in their rooms and movement between different parts of the facility is completely stopped until [the] count clears."  Linkert Decl. ¶ 13.  Moreover, "[a]ny time one client is permitted to openly defy staff and the rules of the facility there is a risk that other clients will follow suit and the security of the entire facility could be compromised."  Linkert Decl. ¶ 14.

### C.  Events of February 8 through 12, 2016

Benson disagrees with the Client Identification Policy.  While Benson's Amended Complaint included challenges to the constitutionality of the Client Identification Policy, those claims have been dismissed from this litigation.  *Benson II*, 2017 U.S. Dist. LEXIS 158017, at *4-8.

---

[3] Policy No. 300.051, effective March 3, 2015.

### 1. BERs for Not Wearing Identification Badge Properly

On February 8, 2016, Defendant Wendy McGowan, a security counselor, approached Benson about wearing "his [identification] badge clipped to the bottom of his shirt," resulting in the badge being "displayed below his waist," as he was heading to dinner. Incident Report 2016003877 at 1 [hereinafter IR 3877], Ex. A to Decl. of Anita Moonen, ECF No. 100; *accord* Benson Dep. 42:4-19, 45:17-46:4, 49:17-50:9. Benson did not comply with McGowan's instructions to reposition his identification badge so that it was "between his neck and his waist" in accordance with the Client Identification Policy. IR 3877 at 1; *see* Benson Dep. 51:1-17. Benson left his identification badge with staff and went to dinner. Benson Dep. 52:4-19, 146:9-147:3; Incident Report 2016003878 at 1 [hereinafter IR 3878], Ex. A to Moonen Decl.

After he had finished eating, Benson was instructed that he needed to return to his living unit. Benson Dep. 52:24-53:5; *see* IR 3877 at 2, IR 3878 at 1. Benson received a major Behavioral Expectation Report ("BER")[4] for failing to display his identification badge properly. IR 3877 at 2; *see generally* BER 302029820, Ex. C to Moonen Decl., ECF No. 102.

Benson received two additional major BERs that evening for not displaying his identification badge properly after being directed to do so by staff. IR 3878 at 1; Incident Report 2016003890 at 1, Ex. A to Moonen Decl.; *see generally* BERs 302029821, 302029824, Ex. C to Moonen Decl.

---

[4] BERs are "generated when a behavioral expectation is violated" and can be issued "for any minor or major rule violation." Behavioral Expectations Handbook at 4, 16, Ex. 1 to Kneisel Decl., ECF No. 95-1.

### 2.  Placement on Pre-Hearing Restriction Status

The following morning, February 9, Benson was asked by staff if he would comply with wearing his identification badge.  Incident Report 2016003938 at 1 [hereinafter IR 3938], Ex. A to Moonen Decl.; *see* Benson Dep. 55:21-23.  When Benson refused, he was given another major BER and placed on pre-hearing restriction status.  IR 3938 at 1; *see generally* BER 11,783, Ex. C to Moonen Decl.  Because he was on pre-hearing restriction status, Benson was not permitted to go to the dining hall for breakfast.  Benson Dep. 55:6-56:1.

### a.    Pre-Hearing Restriction Status

A client is placed on pre-hearing restriction status by a "supervisor to maintain safety or manage behavior prior to a hearing" before a Behavioral Expectations Unit panel.  Behavioral Expectations Handbook at 7 (quotation omitted); *see* Decl. of Terrance Kneisel ¶¶ 2-3, ECF No. 95.  Pre-hearing restriction status may be used "when a client continues to engage in repetitive rule-breaking behaviors" as a means of "contain[ing] the impact of the rule-breaking behaviors on the therapeutic community."  Kneisel Decl. ¶ 3.  Placement on pre-hearing restriction status is a less restrictive alternative to placing a client in the HSA "when attempting to manage client behavior."  Kneisel Decl. ¶ 3.

When a client is on pre-hearing restriction status, the client is expected to remain in his room, with the door closed, "except for a ten[-]minute window each hour, as designated by unit staff, to utilize the staff office, place phone calls, and submit requests." Behavioral Expectations Handbook at 7; *see* Kneisel Decl. ¶ 4.  Additionally, a client on pre-hearing restriction status is required to eat meals in his living unit.  Kneisel Decl. ¶ 4;

Behavioral Expectations Handbook at 7. The client is expected to retrieve his meals from the unit desk and eat in the unit common area rather than back in his room. Kneisel Decl. ¶¶ 4, 6; Benson Dep. 56:2-57:6. This discourages antisocial behaviors and encourages clients "to provide for themselves" rather than "expect[ing] to be waited on." Kneisel Decl. ¶¶ 5-6.

### b.    Food Offered to Benson

Beginning with breakfast on February 9 and continuing through lunch on February 11, a staff member came to Benson's room during mealtimes and told him there was a meal for him at the unit desk. Benson Dep. 57:16-58:5, 67:4-18, 71:10-13, 76:11-15, 81:17-20, 92:7-12, 94:17-25, 95:3-6; *see also* Benson's Mem. in Opp'n at 16, ECF No. 113. Benson was asked if he would take his identification badge back, retrieve the meal, and eat on the living unit. Benson Dep. 67:4-18, 70:7-22, 71:10-13, 76:11-15, 81:17-20, 92:7-12, 94:17-25, 95:3-6; *see also* Benson's Mem. in Opp'n at 16. Each time, Benson refused. Benson Dep. 58:11-24, 67:4-18, 71:10-15, 81:17-22, 92:7-16, 94:17-95:9. Instead, Benson asked for his meals to be brought to his room. Benson Dep. 59:7-15; *see* Benson Dep. 66:14-17, 73:17-23. At his deposition, Benson explained that he "was protesting wearing the [identification] badge," and he would have eaten if meals had been brought to his room or he had not been required to wear the identification badge. Benson Dep. 66:4-67:3. Throughout this time, there was water available to Benson in his room. Benson Dep. 71:21-72:3.

On February 11, Benson was offered dinner approximately 30 minutes after being moved to the HSA. Incident Report 2016004285 at 1 [hereinafter IR 4285], Ex. A to

7

Moonen Decl.; Benson Dep. 81:7-12, 119:6-11. *See generally infra* Section III.C.3. Benson, however, declined to eat it, stating that he was not hungry. IR 4285 at 1. Benson testified that the meal was spaghetti and he generally does not eat spaghetti because the acidity upsets his stomach. Benson Dep. 118:17-119:5. Benson further testified that he did not want to deal with the pain of an upset stomach after not having eaten for a few days. Benson Dep. 118:17-119:5. Benson also clarified that it was his choice not to eat the meal provided and this meal is not at issue in this litigation. Benson Dep. 119:13-18, 120:5-10.

### c. Additional BERs

Benson received more major BERs on February 9 and 10 for not having his identification badge, including during ID verification counts. *See, e.g.*, Incident Report 2016004017 at 1 [hereinafter IR 4017], Incident Report 2016004110 at 1 [hereinafter IR 4110], Ex. A to Moonen Decl.; *see generally* BER 302029842, 302030025, 302029852, Ex. C to Moonen Decl. During the ID verification counts, it was noted that Benson had left his identification badge with staff on February 8 and was refusing to wear it. IR 4017 at 1, IR 4110 at 1. Benson was asked if he would take his identification badge back and, when he refused, he was given a major BER. IR 4017 at 1, IR 4110 at 1; *see also* Benson Dep. 151:12-153:2, 174:5-175:16.

Benson also received minor BERs on February 9 and 10 for refusing to take back his identification badge during break times and lost break times as a result. *See, e.g.*, Incident Report 2016004030 at 1, Ex. A to Moonen Decl.; *see generally* BER 11,796, 11,807, Ex. C to Moonen Decl.

8

### 3. Placement in the HSA

At some point after lunch on February 11, Defendants Andrea Kosloski (the unit director of Benson's living unit) and Debbie Thao (a clinical supervisor) attempted to talk with Benson regarding his refusal to wear his identification badge.  *See* Decl. of Andrea Kosloski ¶¶ 1, 4, ECF No. 96; Decl. of Debbie Thao ¶ 2, ECF No. 107; Benson Dep. 96:5-97:3, 108:14-109:3, 183:24-184:13.

Late that afternoon, another ID verification count was conducted.  *See, e.g.*, Incident Report 2016004251 at 1 [hereinafter IR 4251], Ex. A to Moonen Decl.  Benson was twice asked if he would take his identification badge back.  IR 4251 at 1; *see* Benson Dep. 97:4-11.  When he refused, MSOP staff initiated the facility's Incident Command System.  IR 4251 at 1; Benson Dep. 95:14-23, 97:4-12, 98:19-22.  Benson also received another major BER.  *See generally* BER 302029867, Ex. C to Moonen Decl.

Defendant Nathan Madsen and three other members of a security team known as the "A-team" responded.  Incident Report 2016004236 at 1 [hereinafter IR 4236], Incident Report 2016004246 at 1 [hereinafter IR 4246], Incident Report 2016004291 at 1 [hereinafter IR 4291], Ex. A to Moonen Decl.; Benson Dep. 99:17-100:7; *see also* IR 4251 at 1.  The A-team "typically escort[s] clients to [the] HSA."  Linkert Decl. ¶ 6; *see* Benson Dep. 100:3-10.

#### a. Wrist Restraints/Handcuffs

The A-team uses "wrist restraints," or handcuffs, before taking a client to the HSA.  Linkert Decl. ¶ 6.  This is because "[a] client who is placed in [the] HSA as a result of exhibiting dangerous behavior that is uncontrollable by any other means

typically has refused to follow the directives of staff and the rules of the program." Linkert Decl. ¶ 6. The behavior of such a client "is generally unpredictable and it is very possible that [the client] will continue to exhibit out of control behavior and refuse to comply with directives while being escorted to [the] HSA." Linkert Decl. ¶ 6. Handcuffs minimize this risk and protect the safety of staff and others while a client is being escorted to the HSA. Linkert Decl. ¶ 6.

Madsen informed Benson that he would be placed in the HSA if he continued to refuse to display his identification badge. IR 4246 at 1; *see* IR 4236 at 1; IR 4291 at 1. When Benson responded that he would not take back his identification badge, Madsen directed him to face the wall "and place his arms behind his back." IR 4246 at 1; Benson Dep. 110:1-7. Benson complied. IR 4246 at 1; IR 4236 at 1; IR 4291 at 1; Benson Dep. 110:1-7. Madsen then secured Benson's right arm while another security counselor secured his left, and a third security counselor applied the handcuffs. IR 4246 at 1; IR 4236 at 1; IR 4291 at 1; Benson Dep. 100:11-17; *see* Benson Dep. 109:19-22. Madsen and one of the other security counselors escorted Benson to the HSA. IR 4246 at 1; IR 4236 at 1; IR 4291 at 1; Benson Dep. 100:11-17; *see* Benson Dep. 109:23-110:9. In total, Benson was restrained for approximately six minutes. IR 4251 at 1; *see also* IR 4236 at 1; IR 4246 at 1; IR 4291 at 1.

During his deposition, Benson testified that Madsen and the other security counselors "were professional and respectful" and did not use unnecessary force. Benson Dep. 110:18-23. Benson testified that the handcuffs were not too tight and he was not injured. Benson Dep. 111:20-112:7.

10

### b.    Unclothed Visual Body Search

### i.    Required Before HSA Placement

MSOP requires clients to undergo an unclothed visual body search before being placed in the HSA.  Searches – Clients Policy at 2,[5] Ex. 1 to Linkert Decl., ECF No. 98-1; High Security Area Policy at 1,[6] Ex. 3 to Linkert Decl., ECF No. 98-1.  An unclothed visual body search, or strip search, is "the visual inspection by staff of the same gender of all body surfaces, requiring the person to remove his or her clothing."  Searches – Clients Policy at 1.

As explained by the security director of MSOP's Moose Lake facility, "it is vital for the safety of the clients placed in [the] HSA and HSA staff that the area remain free of any objects that could be used to inflict injury on self or others."  Linkert Decl. ¶ 4; *see* Linkert Decl. ¶ 1.  "Even if a client placed in [the] HSA does not appear to be an immediate threat to physically harm himself or others, that client needs to be subject to [an unclothed visual body search] to ensure that he does not bring an object into [the] HSA that another client could use for that purpose."  Linkert Decl. ¶ 4.  Pat-down and metal-detection searches are not sufficient as they may not catch items concealed in baggy clothing or body cavities.  Linkert Decl. ¶ 5.  Metal-detection searches will also "not detect non-metal items that could be used as weapons," including plastic pens (which have been used as weapons in the past) and "sharpened plastic toothbrush handles" (which have been found on multiple occasions).  Linkert Decl. ¶ 5.

---

[5] Policy No. 415-5010, effective June 2, 2015.
[6] Policy No. 301.087, effective October 1, 2013.

Further, MSOP staff

> are . . . trained not to remove [the handcuffs] until the client
> agrees to comply with [an unclothed visual body search] or, if
> . . . [a client] refuse[s] to comply, until it is determined that a
> staff-assisted [unclothed visual body search] is unnecessary
> or, if a staff-assisted [unclothed visual body search] is
> necessary, until the staff-assisted [unclothed visual body
> search] is completed.

Linkert Decl. ¶ 7.  This is done for safety reasons.  "[I]f a staff-assisted [unclothed visual

body search] is necessary, then it is much safer for it to be done while the client is already

in restraints and thus less able to actively resist" whereas, if the handcuffs were removed

immediately and a staff-assisted search was necessary, "the client would potentially have

to be placed in restraints again."  Linkert Decl. ¶ 7.

### ii.    Search of Benson

Once they arrived at the HSA, Benson was searched.  IR 4246 at 1; IR 4291 at 1.

Before the handcuffs were removed, Benson was asked if he would comply with an

unclothed visual body search.  Benson Dep. 100:11-18, 113:12-21.  Benson inquired as to

the basis for the search and was told such searches were performed when a client is

placed in the HSA.  Benson Dep. 100:17-101:3.

Benson complied with the unclothed visual body search.  Benson Dep. 113:12-21;

IR 4246 at 1; IR 4291 at 1.  The unclothed visual body search was conducted by Madsen

and other security counselors in the room in the HSA where Benson was placed.  Benson

Dep. 112:8-114:1, 179:19-180:4.  Benson was "asked . . . to run [his] fingers through

[his] hair, turn around, run [his] fingers through [his] hair, turn around, bend over, [and]

spread [his] buttocks open."  Benson Dep. 114:9-14.  Benson was also asked to lift up his

feet and open his mouth and lift his tongue so that staff could see inside with a flashlight. Benson Dep. 114:15-18.

The unclothed visual body search took less than one minute. Benson Dep. 114:24-115:2. There was no physical contact by MSOP staff. Benson Dep. 114:19-23. While Benson felt humiliated during the unclothed visual body search, he did not experience any physical injury. Benson Dep. 115:3-15; *see also* Benson Dep. 139:5-140:13. Benson did not think MSOP staff conducted the unclothed visual body search in a "sadistic" manner, but rather as "trained robots." Benson Dep. 116:9-14.

### 4. The HSA

The HSA is "an area . . . monitored more frequently[]with specialized safety procedures to reduce the risk of harm to clients, staff and the public, and to manage dangerous behavior." High Security Area Policy at 1.

> Clients are placed in [the] HSA for three primary reasons: (1) they are exhibiting dangerous behavior that is uncontrollable by any other means; (2) they are on administrative restriction because they are being investigated for potential criminal behavior; or (3) a psychologist, clinical director, or medical practitioner has determined that they are an imminent risk to harm themselves or others and thus need to be placed in a completely controlled environment to ensure they do not have access to anything they can use to harm themselves or others.

Linkert Decl. ¶ 3.

### a. Conditions in the HSA

Benson described the room in the HSA as "a concrete block with a mattress on top of it, a toilet and that's it." Benson Dep. 112:21-23. The room was approximately the same size as the room in his living unit. Benson Dep. 112:17-20. Benson was given a

13

jail-like uniform, "a canvas-type thing," to wear along with a pair of sandals.  Benson

Dep. 117:1-118:5.  Benson was also given a styrofoam cup for water, another with some

soap in it, "a toothbrush head," and some toothpaste.  Benson Dep. 121:6-122:7.  He

received a "packet" containing his "protective isolation status placement . . . with a small

little floppy pen, an envelope, some paper and . . . a couple of  [client] request[ forms]."

Benson Dep. 121:18-23.  A client can use a "request to get some toilet paper."  Benson

Dep. 121:23-24.

### b.    Protective Isolation Status

Benson was placed in the HSA on "Protective Isolation Status."  Decl. of Kyle

Randa ¶ 6, ECF No. 105; PI Status Placement & Immediate Review at 1, Ex. B to

Moonen Decl., ECF No. 101.  "A client is considered to be on Protective Isolation

[S]tatus when the client is placed in a room, from which the person is not able or

permitted to exit, as a way of defusing or containing dangerous behavior that is

uncontrollable by any other means."  PI Status Policy at 1,[7] Ex. 1 to Decl. of Scott

Benoit, ECF No. 89-1.  "Dangerous behavior" is defined as "behavior that compromises

the safety or security of the treatment program, or disrupts the order of the program to the

extent that safety or security may be jeopardized."  PI Status Policy at 1.  "Security" is

defined as "the measures necessary to achieve the management and accountability of

clients of the facility, staff, and visitors, as well as property of the facility."  PI Status

Policy at 1.  Behavior that is "uncontrollable by any other means" is behavior that has

been "unresponsive to less restrictive alternatives" and "includ[es] exhibiting behavior

---

[7] Policy No. 301.085, effective October 1, 2013.

that the person is unable or unwilling to control." PI Policy Status Policy at 1. Protective Isolation Status may not be used for staff convenience or "as a substitute for programming." PI Status Policy at 1.

Before placing a client on Protective Isolation Status, MSOP staff are directed to "offer less restrictive alternatives to the client in an attempt to defuse the dangerous behavior." PI Status Policy at 1. These alternatives must be documented on the Protective Isolation Status placement form. PI Status Policy at 1.

When Benson was first brought to the HSA, he asked "what behavior [he was] exhibiting that[ was] out of control." Benson Dep. 101:4-7. Benson was told that he refused to take his identification badge back. Benson Dep. 110:23-111:3. *But see* Benson Dep. 101:4-7.

### c.    Review of Protective Isolation Status

Placement on Protective Isolation Status is subject to a number of procedural requirements and a series of reviews. *See* PI Status Policy at 2-5. These include: the initial placement and an immediate review; a review within 4 hours of placement; and a review after 24 hours. PI Status Policy at 2-3. Every 7 days, a panel "review[s] the documentation regarding clients who have been placed on Protective Isolation Status." PI Status Policy at 4. A client may also request that "an MSOP facility director review [the panel's] determination." PI Status Policy at 5.

### i.    Placement & Immediate Review

Defendant Kyle Randa completed the Protective Isolation Status Placement and Immediate Review form for Benson. Randa Decl. ¶ 6; *see generally* PI Status &

Immediate Review.   Randa chronicled Benson's refusal to comply with the Client Identification Policy and take back his identification badge, multiple staff requests that he do so, the BERs, interruptions in client counts, placement on pre-hearing restriction status, and loss of break times.  PI Status & Immediate Review at 1.  Benson was placed on Protective Isolation Status in the HSA "because his behavior was uncontrollable by any other means and compromised the security of the facility by delaying the count." Randa Decl. ¶ 6; *see* PI Status & Immediate Review at 2.  Benson's placement was approved by Defendant Ron Fischer, the group supervisor – officer of the day.[8]  PI Status & Immediate Review at 2.  Benson received a copy of this placement document along with a form in which he could request review of his placement.  Randa Decl. ¶ 6; PI Status Placement & Immediate Review at 2.

### ii.    Benson's Review Request

Shortly thereafter, Benson completed the review request form.   Benson Dep. 120:5-14, 132:18-133:18; *see generally* PI Status Review Request, Ex. B to Moonen Decl.  Benson requested review of his placement on Protective Isolation Status and to be present at the review panel.  PI Status Review Request at 1.  Benson asserted that he was

---

[8] Fischer passed away while this litigation was pending.  *See generally* ECF No. 64.  On March 4, 2019, Defendants filed and served a "Statement Noting Death Upon the Record," identifying Fischer's personal representative and the name and address of the personal representative's attorney.  ECF No. 64 at 1.  Fischer was sued in both his individual and official capacities.  *See, e.g.*, Am. Compl. ¶¶ 9-10, 18-19.  With respect to the claims against Fischer in his individual capacity, Rule 25 provides that such claims must be dismissed if a motion for substitution "is not made within 90 days after service of a statement noting the death."  Fed. R. Civ. P. 25(a)(1).  No motion for substitution has been made and the time to do so has passed.  As for claims against Fischer in his official capacity, Rule 25 provides for automatic substitution of Fischer's successor.  Fed. R. Civ. P. 25(d).  Because the Court does not reach the question of each defendant's personal involvement, *see infra* n.10, the Court merely notes the Rule 25 circumstance.

placed on Protective Isolation Status in the HSA to be fed and as a means of blaming him for food not being provided.  PI Status Review Request at 1-2.

### iii.    4-Hour Review

At approximately 8:30 p.m., Fischer completed the 4-hour review.  PI 4-Hour Status Review at 2, Ex. B to Moonen Decl.; *see* PI Status Policy at 2 (officer of the day reviews placement within four hours); Decl. of Scott Gianinni ¶ 3, ECF No. 93.  While a client's comments and any request for review of placement are to be included in the 4-hour review, no comments or request for review from Benson were noted.  *See* PI 4-Hour Status Review at 1; PI Status Policy at 2; Benson Dep. 135:5-9.  Fischer noted that Benson had "exhausted all less restrictive alternatives offered to him and continued to refuse to comply with count procedure which creates a serious facility security concern," and "[n]o new information ha[d] been made available since his initial placement."  PI 4-Hour Status Review at 1.  Fischer determined that Protective Isolation Status was warranted and should be continued.  PI 4-Hour Status Review at 1-2.

Defendants Scott Gianinni and Vaughn Thompson are also listed as having participated in the review.  PI 4-Hour Status Review at 2; *see* Benson Dep. 177:24-178:16, 180:16-18.  The extent and nature of their participation in the review is not clear from the record.  *See* Gianinni Decl. ¶ 3.

### iv.    Visit by Kosloski & Wilson

During the late morning of February 12, 2016, Kosloski and Defendant Doug Wilson (Benson's therapist) came to speak with Benson.  Incident Report 2016004370 at 1 [hereinafter IR 4370], Incident Report 2016004371 at 1 [hereinafter IR 4371], Ex. A to

17

Moonen Decl.; Benson Dep. 159:15-22, 182:8-183:12; *see also* Benson's Ex. A at A-4. After discussing Benson's concerns, Kosloski emphasized that Benson was expected to wear his identification badge.  IR 4370 at 1-2, IR 4371 at 1; *see* Benson Dep. 154:3-157:14.  Benson ultimately agreed to take back his identification badge.  IR 4371 at 1; *see* Benson Dep. 129:12-130:20, 136:4-137:2; IR 4370 at 1-2.

### v.    24-Hour Review & Release

At approximately 4:30 p.m. on February 12, 2016, roughly 24 hours after Benson's placement, Fischer completed the 24-hour review.  PI 24-Hour Status Review at 2, Ex. B to Moonen Decl.; *see* PI Status Policy at 3 (officer of the day reviews placement after 24 hours).  Fischer noted that Benson "ha[d] remained in behavioral control during his protective isolation placement which [wa]s being discontinued at this time."  PI 24-Hour Status Review at 1; *see generally* Discontinuation of PI Status, Ex. B to Moonen Decl.  Vaughn is also noted to have participated in this review.  PI 24-Hour Status Review at 2.

### vi.    Panel Review

During the panel review of a client's placement on Protective Isolation Status, "[t]he client will have an opportunity to present evidence to the [panel] to explain why the Protective Isolation Status is believed to be unwarranted."  PI Status Policy at 4.

Benson's placement was reviewed by the panel on February 17, 2016, and Benson requested to be present.  PI Status Review Request at 1; PI Panel Review at 1, Ex. B to Moonen Decl.  Defendant Scott Benoit was one of the panel members.  Benoit Decl. ¶ 4; PI Panel Review at 2.  During the panel review, Benson expressed his concerns about

wearing the identification badge and the lack of communication in response to these concerns.  PI Panel Review at 1; *see* Benoit Decl. ¶ 4.  Benson also expressed that his placement on Protective Isolation Status in the HSA was motivated by an effort to get him to eat rather than behavior warranting such placement.  PI Panel Review at 1.  The panel determined that Benson's placement on Protective Isolation Status in the HSA was warranted and in accordance with policy.  Benoit Decl. ¶ 5; PI Review at 1.

## IV. ANALYSIS

Defendants and Benson have each moved for summary judgment on the remaining claims.  Under Rule 56, courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation omitted); *see* Fed. R. Civ. P. 56(c)(1)(A).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party."  *Pena v. Kindler*, 187 F. Supp. 3d 1070, 1076 (D. Minn. 2016) (citing *Anderson*, 477 U.S. at 252).  "On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party."  *Id.* (citing *Anderson*, 477 U.S. at 255).

19

"To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue for trial." *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49); *see also Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) ("The nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'") (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "[T]here is no genuine issue for trial if 'the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.'" *Ball v. City of Lincoln*, 870 F.3d 722, 727 (8th Cir. 2017) (quoting *Torgerson*, 643 F.3d at 1042).

Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1); *accord Torgerson*, 643 F.2d at 1043. The Court recognizes that Benson is proceeding pro se. While pro se plaintiffs are entitled to have their pleadings liberally construed, "Rule 56 remains applicable." *Sisney v. Kaemingk*, 886 F.3d 692, 697 (8th Cir. 2018) (quotation omitted).

## A. Section 1983 Claims

Benson's claims arise primarily under 42 U.S.C. § 1983, which provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United

States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."  "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

Civilly committed individuals like Benson are not prisoners and are "entitled to 'more considerate treatment and conditions of confinement.'" *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982)).  At the same time, because Benson "has been civilly committed to state custody as a dangerous person, his liberty interests are considerably less than those held by members of free society."  *Id*.  Further, while civilly committed individuals are not "prisoner[s] per se," the Eighth Circuit Court of Appeals has held that their "confinement is subject to the same safety and security concerns as that of a prisoner."  *Beaulieu v. Ludeman*, 690 F.3d 1017, 1028 (8th Cir. 2012) (quotation omitted); *accord Ingrassia v. Schafer*, 825 F.3d 891, 897 (8th Cir. 2016).  Accordingly, when evaluating the constitutional claims of civilly committed individuals, courts have looked to the prison context and found analogous the rights retained by pretrial detainees.  *See, e.g.*, *Youngberg*, 457 U.S. at 319-20; *Hall v. Ramsey Cty.*, 801 F.3d 912, 919 (8th Cir. 2015); *Beaulieu*, 690 F.3d at 1025, 1028; *Serna v. Goodno*, 567 F.3d 944, 948-49 (8th Cir. 2009).  With this in mind, the Court turns to Benson's remaining claims.

21

### 1.  Due Process Claims

"The Due Process Clause of the Fourteenth Amendment ensures that states do not deprive individuals of life, liberty, or property without due process of law." *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010) (citing U.S. Const. amend XIV, § 1); *accord Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir. 1999).  "This clause has two components: the procedural due process and the substantive due process components." *Singleton*, 176 F.3d at 424.

### a.    Substantive Due Process

The right to substantive due process under the Fourteenth Amendment "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Norris v. Engles*, 494 F.3d 634, 637 (8th Cir. 2007) (quotation omitted).  "In the context of substantive due process, an individual must overcome a very heavy burden to show a violation of the Fourteenth Amendment." *Hall*, 801 F.3d at 917.

> To establish a violation of an individual's substantive due process rights, the plaintiff must demonstrate *both* that the official's conduct was conscience-shocking, *and* that the official violated one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.

*Norris*, 494 F.3d at 637-38 (quotation omitted); *accord Karsjens v. Piper*, 845 F.3d 394, 408 (8th Cir. 2017); *Hall*, 801 F.3d at 917.

> To meet this high standard, . . . the alleged substantive due process violations must involve conduct so severe[,] so disproportionate to the need presented, and so inspired by

22

> malice or sadism rather than a merely careless or unwise
> excess of zeal that it amounted to a brutal and inhumane
> abuse of official power literally shocking to the conscience.

*Karsjens*, 845 F.3d at 408 (quotation omitted).

"The theory of substantive due process is properly reserved for truly egregious and extraordinary cases." *Mills*, 614 F.3d at 498 (quotation omitted); *see also Montin v. Gibson*, 718 F.3d 752, 755 (8th Cir. 2013) ("[A] plaintiff may maintain a substantive due process claim only if the contested state action is so egregious or outrageous that it is conscience-shocking.") (quotation omitted); *Hall*, 801 F.3d at 917-18 ("[A] government official's conduct must be 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'") (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847-48 n.8 (1998)). As such, "even if it is determined that the conduct at issue violated a fundamental right, it will constitute a substantive due process violation only if it is also determined to shock the conscience." *Norris*, 494 F.3d at 638; *see Karsjens*, 845 F.3d at 408, 410; *Montin*, 718 F.3d at 755.

### i.    Denial of Food (Count II)

"Civilly-committed individuals have a constitutional right to nutritionally adequate food." *Ingrassia*, 825 F.3d at 897; *see Bradford v. Blake*, No. 4:05-CV-136 CAS, 2006 WL 744307, at *5 (E.D. Mo. Mar. 23, 2006) ("Several courts have found that denial of food violates the constitutional rights of those in the state's custody."). In Count II, Benson claims he was denied food from breakfast on February 9 through lunch on February 11 because he refused to wear and take back his identification badge. "To demonstrate a constitutional violation, [Benson] must show that the defendants were

deliberately indifferent to his nutritional needs, that is, 'failed to act despite . . . knowledge of a substantial risk of harm.'" *Ingrassia*, 825 F.3d at 897 (alteration in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)); *see Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006) ("deliberate indifference is the appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care, and reasonable safety").

MSOP staff were aware that Benson was on pre-hearing restriction status, required to remain in his room except for authorized breaks, and not allowed to eat in the general dining area. The record shows, and Benson agrees, that for each meal between breakfast on February 9 through lunch on February 11, a staff member came to his room and told him a meal was available to him. Benson was asked if he would take back his identification badge, retrieve the meal, and eat on the living unit. Each time, Benson refused. Benson has presented no evidence of deliberate indifference to his nutritional needs. As Benson himself explained, he "was refusing to take the [identification badge] to go get [his] food, which subsequently led to [him] not eating." Benson Dep. 66:4-5. Benson's disagreement with the Client Identification Policy and its enforcement does not mean that staff was deliberately indifferent to his nutritional needs. There is no dispute Benson was consistently offered food at each mealtime. *See Lott v. Roper*, No. 4:04CV989 RWS, 2006 WL 2038635, at *4 (E.D. Mo. July 19, 2006) ("Plaintiff's eighth amendment claims fails as a matter of law because the undisputed facts demonstrate that he received adequate food while on alternative meal service but chose not to eat it.").

In opposing Defendants' motion, Benson continues to express his disagreement with the Client Identification Policy. But, Benson's compelled-speech claim was previously dismissed by the district court. *Benson II*, 2017 U.S. Dist. LEXIS 158017, at *4-7. And, to the extent Benson argues that the Client Identification Policy (and MSOP policies in general) violate state law, such claims are not part of this litigation. *See* ECF No. 81 at 6-19 (denying motion to amend).

Benson argues that food was "weaponized as a means to get [him] to take back [his identification] badge." Benson's Mem. in Opp'n at 16. But, "[t]his is not a situation where [Benson] had no choice or was not provided with any food." *Bradford*, 2006 WL 744307, at *5. Rather, food was made available to Benson and he elected not to take back and wear his identification badge in accordance with the Client Identification Policy. Benson cannot force MSOP to change its policies by demanding that he be given meals on his terms and then contend his constitutional rights were violated when MSOP did not capitulate. *See, e.g.*, *Rodriguez v. Briley*, 403 F.3d 952, 953 (7th Cir. 2005) ("A prisoner cannot force the prison to change its rules by going on a hunger strike and blaming the prison for his resulting loss of weight."); *Talib v. Gilley*, 138 F.3d 211, 216 (5th Cir. 1998) ("Given the ease with which Talib could have complied with reasonable prison regulations, he in a very real sense carried the keys to the kitchen cupboard. He chose not to unlock it, and it is not for the federal courts to intervene in his personal decision.") (quotation omitted).

Benson also argues that a factual dispute exists regarding when clients are allowed to eat in their rooms based on evidence in the record that clients are served meals in their

rooms during lockdown situations.[9]  Benson argues that his placement on pre-hearing restriction status was "essentially" a lockdown, and therefore he "should[ ha]ve been provided a meal in his room."  Benson's Mem. in Opp'n at 16.  Benson is correct that evidence in the record shows that clients are served meals in their rooms during a lockdown, *see, e.g.*, Kosloski Decl. ¶ 3; Linkert Decl. ¶ 15, but Benson has presented no evidence that placement on pre-hearing restriction status is the same as a lockdown.  The undisputed evidence is that pre-hearing restriction status is a behavioral tool and the retrieval and consumption of meals on the living unit encourages positive behavior, discourages negative behavior, and avoids reinforcing negative behavior by providing special services (such as hand-delivering food to Benson).

Viewing the evidence in the light most favorable to Benson, no reasonable jury could conclude that requiring him to take back and wear his identification badge in accordance with the Client Identification Policy in order to retrieve his meals rises to the level of being so severely egregious or outrageous as to demonstrate a brutal and inhumane abuse of power shocking to the conscience.  *See Bradford*, 2006 WL 744307, at *6 ("[D]enying plaintiff access outside of the ward when he refused to wear the badge or a personal food tray in his room when he chose not [to] wear the badge and leave the

---

[9] Benson states this information comes from the Kneisel Declaration: "Somewhat contradicting however, is how Def. Terry Kneisel (MSOP Assistant Director) describes 'there are situations where a clients [sic] have to stay in their rooms – for example, because of emergency or other situation requiring a facility lockdown – and are required to eat in their rooms.'"  Benson's Mem. in Opp'n at 15-16.  While Benson attributes this quote to Paragraph 4 of the Kneisel Declaration and page 7 of the relevant Behavioral Expectations Handbook, the Court has not been able to locate the quoted language.  The closest the Court has found is language in Paragraph 3 of the Kosloski Declaration and Paragraph 15 of the Linkert Declaration.  *See* Kosloski Decl. ¶ 3 ("MSOP clients are generally not served meals in their rooms unless because of extenuating circumstances they are physically unable to leave their room[s] or are prohibited from leaving their room[s] because the facility or unit is locked down for a period of time."), Linkert Decl. ¶ 15 ("Clients are only served meals in their room[s] when they are physically unable to leave their rooms or prevented from doing so by MSOP—for example, when the facility or a living unit is locked down during meal times because of a search.").  The Court surmises this may have been the result of a typographical error.

ward does not demonstrate a level of abuse of power that is 'so brutal' and 'so offensive' that it does not comport with traditional ideas of fair play and decency."). Because it is undisputed that Benson was offered food at each mealtime between breakfast on February 9 and lunch on February 11, and requiring Benson to take back and wear his identification badge in order to retrieve his meals is not conduct that shocks the conscience, the Court recommends that Defendants' motion be granted and Benson's motion be denied with respect to Count II.[10]

### ii.    Use of Wrist Restraints/Handcuffs (Count III)

In Count III, Benson claims the use of handcuffs while he was being escorted to the HSA violated his constitutional rights. The precise contours of this claim are not altogether clear.

Although Benson argues that he was willing to go to the HSA and the use of handcuffs was excessive in relation to his refusal to take back and wear his identification badge, Benson's claim does not appear to be one of excessive force. Benson does not contend, and the evidence in the record does not support, that he was injured when Madsen and the other security counselors handcuffed him or that they used objectively unreasonable force in the process. *Cf. Beaulieu*, 690 F.3d at 1033; *Ivey v. MSOP*, No. 12-cv-30 (DWF/TNL), 2020 WL 3064720, at *4-6 (D. Minn. May 20, 2020), *adopting report and recommendation*, *Ivey v. Williams*, 2020 WL 3060782 (D. Minn. June 9, 2020), *appeal filed*, No. 20-2405 (8th Cir. July 13, 2020). Benson himself testified that

---

[10] Because the Court concludes that no constitutional violation occurred, the Court declines to address Defendants' arguments regarding the personal involvement of McGowan, Thao, Wilson, Giannini, Thompson, and Madsen in the denial of food. Defs.' Mem. in Supp. at 17-19, ECF No. 86. *See Beaulieu*, 690 F.3d at 1033 n.7.

Madsen and the other security counselor were professional and respectful, the handcuffs were not too tight, and he was not injured as a result.

In *Youngberg*, "[t]he Supreme Court . . . recognized that involuntarily civilly committed persons hold a protected liberty interest in being free from unnecessary bodily restraint." *Montin*, 718 F.3d at 755-54 (citing 457 U.S. at 320-22). Under *Youngberg*, "[t]he test for assessing the constitutionality of such a restraint is a 'professional judgment' test." *Id.* at 755 (citing 457 U.S. at 321). The Eighth Circuit has applied this test to the use of restraints at MSOP. *Beaulieu*, 609 F.3d at 1031-33; *see also, e.g.*, *Semler v. Ludeman*, No. 09-cv-732 (ADM/SRN), 2010 WL 145275, at *25-27 (D. Minn. Jan. 8, 2010).

"Pursuant to this test, great deference is owed to the professional judgment of a qualified professional charged with balancing the plaintiff's freedom from bodily restraint against the safety of the public, the plaintiff, and other patients." *Montin*, 718 F.3d at 755 (citing *Youngberg*, 457 U.S. at 321).

> [T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Youngberg*, 457 U.S. at 323 (footnotes omitted); *accord Beaulieu*, 690 F.3d at 1032-33.

Benson argues that the use of handcuffs "appear[ed] to be [for] whimsical reasons alone." Benson's Mem. in Opp'n at 23. MSOP uses handcuffs when escorting clients to the HSA because a client exhibiting the type of behavior warranting placement on

Protective Isolation Status in the HSA has generally refused to follow staff directives and comply with program rules. A client exhibiting such behavior is unpredictable and may well continue to be disorderly and refuse to comply with staff while being escorted. Handcuffs minimize the risk of uncontrolled behavior and protect the safety of staff and other clients. *See Beaulieu*, 690 F.3d at 1032 ("'The State 'may not restrain residents except when and to the extent that professional judgment deems this necessary to assure safety.'") (quoting *Youngberg*, 457 U.S. at 324).

There may be other, less restrictive ways of escorting clients to the HSA. But, "[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.'" *Id.* (quoting *Youngberg*, 457 U.S. at 321). And, Benson has not pointed to any evidence that the use of handcuffs under these circumstances amounts to a substantial departure from accepted professional judgment, practice or standards. *See id.*

Benson also argues that the use of handcuffs was inconsistent with MSOP's policy regarding use of force and restraints, referencing a 2019 Use of Force and Restraints Policy. *See* Benson's Ex. A at A-36 to A-39. First, the events in question took place in 2016. The policy Benson cites to is from 2019. Second, even assuming for purposes of these motions only that handcuffing Benson under these circumstances was inconsistent with MSOP policy, the violation of an institutional policy alone does not constitute a constitutional violation. *See Kennedy v. Blankenship*, 100 F.3d 640, 643 (8th Cir. 1996); *see also Smith v. Gray, Rucker & Harkins*, 259 F.3d 933, 933-34 (8th Cir. 2001) (per curiam).

MSOP uses handcuffs when escorting clients to the HSA because of the inherent unpredictability and safety risks associated with a client whose dangerous behavior has been uncontrollable by other means.  As discussed more fully in the next section, Benson was exhibiting dangerous behavior and had been unresponsive to other less restrictive measures.  Benson was handcuffed for less than 10 minutes.  It is undisputed that Madsen and the other security counselor treated Benson professionally and respectfully, and Benson was not injured.

Viewing the evidence in the light most favorable to Benson, no reasonable jury could conclude that the brief use of handcuffs to escort him to the HSA after he repeatedly refused to comply with the Client Identification Policy and staff requests to take back and wear his identification badge rises to the level of being so severely egregious or outrageous as to demonstrate a brutal and inhumane abuse of power shocking to the conscience.  *See Semler*, 2010 WL 145275, at *27; *see also Green v. Lake*, No. 14-cv-1056 (ADM/SER), 2019 WL 1324851, at *5 (D. Minn. Mar. 25, 2019) [hereinafter *Green II*] ("Green's placement in [the] HSA for more than 24 hours and being handcuffed for four hours did not impose a significant and unusual hardship in relation to the ordinary incidents of life at a secured facility such as MSOP."), *aff'd*, 793 F. App'x 467 (8th Cir. 2020) (per curiam).  Therefore, the Court recommends that Defendants' motion be granted and Benson's motion be denied with respect to the use-of-handcuffs claim in Count III.[11]

---

[11] The Court similarly declines to address Defendants' arguments regarding the personal involvement of Benoit and Kosloski in the use of handcuffs.  Defs.' Mem. in Supp. at 25-26.  *See supra* n.10.

### iii.    Placement in the HSA (Count III)

In Count III, Benson claims that his placement in the HSA on Protective Isolation Status for approximately 24 hours was an unreasonable seizure.  In *Benson v. Piper*, a separate action brought by Benson alleging retaliation in connection with this lawsuit, this Court previously concluded that "the curtailment of any liberty interest resulting from . . . placement [in the HSA] is more properly viewed in the context of [a] due process claim[]."  No. 17-cv-266 (DWF/TNL), 2019 WL 2017319, at *18 (D. Minn. Jan. 25, 2019), *adopting report and recommendation*, 2019 WL 1307883 (D. Minn. Mar. 22, 2019).  The Court incorporates by reference that prior discussion regarding the professional-judgment test for unnecessary bodily restraint under *Youngberg* and the conscience-shocking test applied in the absence of actual physical restraint.  *Id.* at *24-26.  Other than the use of handcuffs to bring Benson to the HSA addressed above, there is no evidence in the record that Benson was subject to actual physical restraint during the 24 hours he was in the HSA.  Accordingly, in the absence of actual physical restraint, the Court considers whether Benson's placement in the HSA on Protective Isolation Status for approximately 24 hours was so egregious or outrageous as to shock the contemporary conscience.  *Id.* at *26.

Taking the record in the light most favorable to Benson, the conditions in the HSA are more restrictive than the conditions of his living unit.  But, there is no evidence these conditions were "so severe that they could be presumed to be inspired by malice or sadism."  *Flores v. Moser*, No. 16-cv-1860 (ADM/KMM), 2019 WL 2016789, at *6 (D. Minn. Jan. 7, 2019), *adopting report and recommendation*, 2019 WL 1076075 (D. Minn.

Mar. 7, 2019). There is no evidence that Benson was deprived of basic needs. *See Favors v. Hoover*, No. 13-cv-428 (JRT/LIB), 2014 WL 4954687, at *16 (D. Minn. Sept. 30, 2014). Indeed, "[t]he inadequacy of [Benson's] due process claim can be readily understood" in comparison with *Smith v. Copeland*, 87 F.3d 265 (8th Cir. 1996), where the Eighth Circuit held that a pretrial detainee failed to state a due process claim based on his placement in segregation for four days in which the toilet overflowed and "he was made to endure the stench of his own feces and urine." *Wickner v. Collelo*, No. 11-cv-3448 (DWF/JJK), 2011 WL 6960975, at *3 n.2 (D. Minn. Dec. 14, 2011) (quotation omitted), *adopting report and recommendation*, 2012 WL 32940 (D. Minn. Jan. 6, 2012); *see also Stickley v. Byrd*, 703 F.3d 421, 423-24 (8th Cir. 2013).

Further, Benson does not claim, and there is no evidence to support, that he was subject to a prolonged period of isolation. *See Flores*, 2019 WL 2016789, at *6. The undisputed evidence shows that Benson was released from the HSA after approximately 24 hours. *See Beaulieu*, 690 F.3d at 1045 (24 hours is "too short a time to constitute a due process violation"); *cf. Williamson v. Stirling*, 912 F.3d 154, 181 (4th Cir. 2018) (pretrial detainee "presented evidence on which a reasonable factfinder could conclude that his three-and-a-half years of solitary confinement were so excessive relative to his infractions—and the defendants so arbitrary in their actions—that [he] suffered unconstitutional punishment in violation of his substantive due process rights").

Benson argues that he "was[ no]t exhibiting any dangerous or uncontrollable behavior to justify [his] placement" on Protective Isolation Status in the HSA. Benson's Mem. in Opp'n at 20-21. Benson argues that, because staff was able to identify him by

32

other methods during client counts, the HSA was used "in a weaponized way to abuse the process." Benson's Mem. in Opp'n at 21.

An individual civilly committed to MSOP has been determined by a state court to be "a sexually dangerous person or ha[ve] a sexual psychopathic personality." *Karsjens*, 845 F.3d at 399; *accord Senty-Haugen*, 462 F.3d at 880. The Eighth Circuit has repeatedly held that the facilities in which these individuals are confined are subject to the same institutional safety and security concerns as corrections facilities. *See, e.g.*, *Ingrassia*, 825 F.3d at 897; *Beaulieu*, 690 F.3d at 1028; *see also Senty-Haugen*, 462 F.3d at 887 ("The safety of the [MSOP] facility is one of the key responsibilities of Offender Program officials . . . ."), 888 (MSOP officials "have a 'vital interest' in maintaining a secure environment"). An accurate client count is integral to maintaining the safety and security of MSOP's facilities.

The identification badges facilitate the accurate identification and tracking of clients, which assists in maintaining institutional safety and order. There is no dispute that Benson's refusal to take back and wear his identification badge interrupted the client count on several occasions. That other methods may have been available to verify Benson's identity does not change the fact that his repeated refusal interfered with these security measures. Behavior that interferes with the safety or security of the facility, including the management of clients, is deemed to be dangerous behavior under the Protective Isolation Status Policy. While Benson may not have been engaged in the type of physical violence one might typically associate with dangerous behavior, his behavior nevertheless interfered with the safety and security of the Moose Lake facility, thus

33

meeting the definition of dangerous behavior. Moreover, there is no dispute that Benson persisted in his refusal to take back and wear his identification badge despite multiple staff requests and intermediate disciplinary measures. As Benson did not change his behavior in response to less restrictive alternatives, his behavior was, by definition, uncontrollable.

No reasonable jury could conclude that Benson's temporary placement in a more restrictive setting after he repeatedly interfered with measures integral to managing and maintaining the safety and security of the Moose Lake facility rises to the level of being so severely egregious or outrageous as to demonstrate a brutal and inhumane abuse of power shocking to the conscience. Therefore, the Court recommends that Defendants' motion be granted and Benson's motion be denied with respect to the HSA-placement claim in Count III.[12]

### b.    Procedural Due Process (Count V)

In Count V, Benson alleges that his right to procedural due process was violated when he was placed on Protective Isolation Status in the HSA. Benson alleges that he was not "presented with any evidence" to support his placement and there was no indication "that any less restrictive alternatives to confinement in the HSA were considered." Am. Compl. ¶ 21.

"Due process is a flexible concept, requiring only 'such procedural protections as the particular situation demands.'" *Clark v. Kansas City Missouri Sch. Dist.*, 375 F.3d

---

[12] The Court similarly declines to address Defendants' arguments regarding the personal involvement of Benoit and Kosloski in Benson's placement on Protective Isolation Status in the HSA. Defs.' Mem. in Supp. at 25-26. *See supra* n.10.

698, 702 (8th Cir. 2004) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)); *accord Mickelson v. Cty. of Ramsey*, 823 F.3d 918, 924 (8th Cir. 2016) (noting "requirements of due process are not rigid"). As this Court previously stated, "[t]he federal constitution requires that both civil detainees and pretrial detainees be afforded procedural due process protections before they are subjected to punishment." *Benson v. Piper*, No. 16-cv-509 (DWF/TNL), 2016 U.S. Dist. LEXIS 190502, at *19-20 (D. Minn. Dec. 8, 2016) [hereinafter *Benson I*], *adopting report and recommendation as modified*, *Benson II*, 2017 U.S. Dist. LEXIS 158017; *accord Benson II*, 2017 U.S. Dist. LEXIS 158017, at *8; *see, e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, . . . the proper inquiry is whether those conditions amount to punishment of the detainee."); *Hall*, 801 F.3d at 919 ("We have not previously decided whether the 'conditions of confinement' standard for pretrial detainees applies to involuntarily committed individuals. We now apply that standard.").

"Not all restrictions imposed in the civil commitment context will amount to punishment." *Benson II*, 2017 U.S. Dist. LEXIS 158017, at *9. "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Bell*, 441 U.S. at 539 (footnote omitted); *accord Hall*, 801 F.3d at 919. These legitimate governmental objectives include maintaining order and security. *Bell*, 441 U.S. at 540; *Benson II*, 2017 U.S. Dist. LEXIS 158017, at *9; *see Hall*, 801 F.3d at 919. "Conversely,

35

if a restriction or condition is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment . . . ." *Bell*, 441 U.S. at 539.

The undisputed evidence shows that Benson was placed on Protective Isolation Status in the HSA after repeatedly refusing to take back and wear his identification badge. *See Hall*, 801 F.3d at 919. It cannot be reasonably debated that using a photo identification badge as an easy, fast, and reliable method to identify those committed to MSOP is not a proper means of enhancing the safety of a dynamic secured facility. Benson's behavior interfered with measures integral to managing and maintaining the safety and security of MSOP's Moose Lake facility, including disrupting the client count. MSOP has a legitimate governmental interest in maintaining order and a secure environment at its facilities. *Senty-Haugen*, 462 F.3d at 887-88; *see Hall*, 801 F.3d at 919-20. Benson's placement on Protective Isolation Status in the HSA for a temporary period of time after less restrictive alternatives had proven ineffective was reasonably related to managing and maintaining the safety and security of the Moose Lake facility. *See Hall*, 801 F.3d at 919-20. As a result, Benson's placement did not amount to punishment in the constitutional sense, and Defendants are entitled to summary judgment on Count V. *See id.*; *Benson II*, 2017 U.S. Dist. LEXIS 158017, at *8-9 ("The threshold inquiry, therefore, is whether Plaintiff was punished."); *see also Green II*, 2019 WL 1324851, at *5 ("Green's placement in [the] HSA for more than 24 hours and being handcuffed for four hours did not impose a significant and unusual hardship in relation to the ordinary incidents of life at a secured facility such as MSOP.").

36

## 2.  Fourth Amendment Claim (Count IV)

The Fourth Amendment generally protects "against unreasonable searches and seizures."  U.S. Const. amend. IV.  In Count IV, Benson claims the unclothed visual body search constituted an unreasonable search.  "[I]nvoluntarily civilly committed persons retain the Fourth Amendment right to be free from unreasonable searches that is analogous to the right retained by pretrial detainees."  *Beaulieu*, 690 F.3d at 1028 (citing *Serna*, 567 F.3d at 948-49).

To determine "reasonableness" in an institutional setting, a court must balance "the need for the particular search against the invasion of personal rights that the search entails."  *Bell*, 441 U.S. at 558-59.  Four factors are relevant to determining whether the unclothed visual body search was reasonable: "(1) the justification for initiating the search, (2) the scope of the particular intrusion, (3) the place in which the search is conducted, and (4) the manner in which it is conducted."  *Schmidt v. City of Bella Villa*, 557 F.3d 564, 572 (8th Cir. 2009).  Evaluating such a claim also "turns in part on the extent to which this [c]ourt has sufficient expertise and information in the record to mandate, under the Constitution, the specific restrictions and limitations sought by those who challenge the visual search procedures at issue."  *Florence v. Bd. of Chosen Freeholders of the Cty. of Burlington*, 566 U.S. 318, 322 (2012).  "In addressing this type of constitutional claim courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of [institutional] security."  *Id.* at 322-23.

The first factor, justification for the search, weighs in favor of Defendants.  MSOP policy requires that clients undergo an unclothed visual body search before being placed in the HSA.  "MSOP has legitimate concerns in conducting an [unclothed visual body search] when an individual at MSOP enters a new area . . . ."  *Green v. Lake*, No. 14-cv-1056 (ADM/SER), 2019 WL 2016781, at *7 (D. Minn. Jan. 30, 2019) [hereinafter *Green I*], *adopting report and recommendation as modified*, *Green II*, 2019 WL 1324851 (D. Minn. Mar. 25, 2019); *see Larson v. Jesson*, No. 11-cv-2247 (PAM/LIB), 2018 WL 3352926, at *4 (D. Minn. July 9, 2018) ("And still other decisions have found reasonable institutional polices requiring unclothed body searches before detainees are placed in segregated units such as MSOP's HSA.").  Requiring unclothed visual body searches prior to placement in the HSA promotes the safety of MSOP clients and staff by ensuring that a client does not bring an object into the HSA that could be used to harm himself or others.  *See Green I*, 2019 WL 2016781, at *7 ("MSOP is promoting the security of its facility by ensuring that individuals are not concealing drugs or weapons when leaving and entering new areas of the facility.").

Benson takes issue with the "obligatory" nature of the search, arguing that there is no evidence suggesting that he was suspected of possessing contraband or thinking about hurting himself or others.  Courts in this district, however, have held that transfer to the HSA alone provides ample justification for an unclothed visual body search.  *See, e.g.*, *Ivey*, 2020 WL 3064720, at *7; *Green I*, 2019 WL 2016781, at *7; *Larson*, 2018 WL 3352926, at *4.  Further, Benson's argument is precluded by the *Karsjens* class action, which included all clients at MSOP's Moose Lake Facility and upheld MSOP's policy of

conducting unclothed visual body searches without considering a client's individual risk. *Karsjens v. Piper*, 336 F. Supp. 3d 974, 994-96 (D. Minn. 2018); *see, e.g.*, *Gardner v. Minnesota*, No. 16-cv-3999 (JNE/KMM), 2019 WL 1875590, at \*4-7 (D. Minn. Apr. 26, 2019); *Whipple v. Edwards*, No. 13-cv-2861 (JRT/HB), 2019 WL 1324862, at \*5-6 (D. Minn. Mar. 25, 2019).

The next factor is the scope of the intrusion. The Eighth Circuit has acknowledged that an unclothed visual body search "is intrusive and unpleasant," and "[t]he intrusion of such a search is significant." *Serna*, 567 F.3d at 954 (quotation omitted). As Benson stood naked, MSOP staff conducted their visual inspection, which included having him turn around, bend over, and spread his buttocks. There was no physical contact.

The Court does not doubt Benson's feelings of humiliation during this process. The intrusion Benson experienced, however, is similar to an intrusion approved of in *Serna*. Like this case, the defendants in *Serna* "visually inspect[ed] the patients' bodies," and "instructed each patient to turn, bend over slightly, and spread his buttocks." *Id.* at 947. While noting the search was "intrusive," the Eighth Circuit concluded it was "not any more intrusive or demeaning than" the search approved by the Supreme Court in *Bell* and affirmed the grant of summary judgment in favor of the defendants. *Id.* at 954 (quotation omitted). Because the unclothed visual body search of Benson was no more intrusive than the search conducted in *Serna*, this factor also weighs in favor of Defendants.

The third factor is the location of the search. The unclothed visual body search was conducted in the room where Benson was placed in the HSA. The parties do not argue that the location of the search had an impact on the search's reasonableness. There is no contention that the search was conducted in public view. *See Ivey*, 2020 WL 3064720, at *8. This factor therefore weighs in favor of Defendants as well.

The fourth and final factor is the manner in which the search was conducted. The entire search lasted less than one minute. Benson agreed the search was not conducted in an abusive manner. To the extent Benson claims that MSOP staff refused to remove the handcuffs unless he complied with the unclothed visual body search, this use of handcuffs is consistent with MSOP policy and in response to the safety risks posed in the event a staff-assisted unclothed visual body search is needed. "The Court must defer to this judgment unless the record contains 'substantial evidence showing [MSOP's] policies are an unnecessary or unjustified response to problems of [institutional] security.'" *Id.* at *9 (quoting *Florence*, 566 U.S. at 323) (second alteration in original). This factor weighs in favor of Defendants.

In the end, the four *Bell* factors must be considered together; no one factor is dispositive. *See Byrd v. Maricopa Cty. Sheriff's Dep't*, 629 F.3d 1135, 1142 (9th Cir. 2011). On this record, drawing all inferences in favor of Benson, the Court concludes that no reasonable jury could find the unclothed visual body search at issue here violated Benson's Fourth Amendment rights. The search was reasonably justified by safety concerns and the need to prevent the introduction of items into the HSA that a client could use to injure himself or others or that another client could use for these purposes.

40

Although intrusive by its very nature, the search was conducted quickly, humanely, and in a manner consistent with *Serna*. Therefore, the Court recommends that Defendants' motion be granted and Benson's motion be denied with respect to Count IV.[13]

### 3. Supervisory Claims

Because the Court has concluded that Benson's constitutional rights were not infringed, his supervisory claims "automatically fail for lack of an underlying constitutional violation." *Mendoza v. U.S. Immigration & Customs Enf't*, 849 F.3d 408, 420 (8th Cir. 2017); *see, e.g.*, *Brossart v. Janke*, 859 F.3d 616, 627 (8th Cir. 2017); *Brockinton v. City of Sherwood*, 503 F.3d 667, 673 (8th Cir. 2007); *see also Schoettle v. Jefferson Cty.*, 788 F.3d 855, 861-62 (8th Cir. 2015) ("We have long held that neither municipal nor supervisory liability may attach in section 1983 actions unless individual liability is first found on an underlying substantive claim."); *Moore v. City of Desloge*, 647 F.3d 841, 849 (8th Cir. 2011) ("Similarly, to maintain an action for training or supervisory liability, a plaintiff must show the failure to train or supervise caused the injury.").

### B. Claims Under the Minnesota Constitution

Benson has included tandem claims alleging violations of the Minnesota Constitution alongside his § 1983 claims alleging violations of the federal Constitution. Am. Compl. Count III ¶ 10, Count IV ¶ 16.[14] "The Eleventh Amendment bars federal court jurisdiction over state law claims against unconsenting states or state officials when

---

[13] The Court similarly declines to address Defendants' arguments regarding the personal involvement of Benoit and Kosloski in the unclothed visual body search. Defs.' Mem. in Supp. at 25-26. *See supra* n.10.

[14] In the Amended Complaint, the paragraphs are numbered 1 through 28 up through Count I, and then begin again with 1 starting at Count II.

the state is the real, substantial party in interest, regardless of the remedy sought." *Cooper v. St. Cloud State Univ.*, 226 F.3d 964, 968 (8th Cir. 2000) (citing *Pennhurst v. State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)). "The Supreme Court has construed the Eleventh Amendment, which by its express terms applies only to actions against states by citizens of other states, to nevertheless also bar suits in federal court against a state by its own citizens." *Minnesota Pharmacists Ass'n v. Pawlenty*, 690 F. Supp. 2d 809, 815 (D. Minn. 2010) (citing *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974)).

Moreover, "[u]nlike 42 U.S.C. § 1983, Minnesota has no statutory scheme providing for private actions based on violations of the Minnesota constitution." *Riehm v. Engelking*, No. 06-cv-293 (JRT/RLE), 2007 WL 37799, at *8 (D. Minn. Jan. 4, 2007), *affirmed*, 538 F.3d 952 (8th Cir. 2008). Stated differently, "[t]here is no private cause of action for violations of the Minnesota Constitution." *Eggenberger v. West Albany Twp.*, 820 F.3d 938, 941 (8th Cir. 2016) (quotation omitted) (citing cases). Therefore, the Court recommends that Benson's claims based on the Minnesota Constitution be dismissed. *See, e.g.*, *Larson*, 2018 WL 3352926, at *8.

[Continued on next page.]

## V. RECOMMENDATION

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1.  Defendants' Motion for Summary Judgment, ECF No. 84, be **GRANTED**.

2.  Plaintiff's Motion for Summary Judgment, ECF No. 112, be **DENIED**.

3.  This matter be **DISMISSED WITH PREJUDICE** and judgment entered accordingly.


Date: July___29___, 2020                        _____*s/ Tony N. Leung*_____
                                                Tony N. Leung
                                                United States Magistrate Judge
                                                District of Minnesota


                                                *Benson v. Fischer et al.*
                                                Case No. 16-cv-509 (DWF/TNL)


## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).